[No. B164153. Second Dist., Div. One. Aug. 14, 2003.]

JORDAN ALAN, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
UBS PAINEWEBBER INC. et al., Real Parties in Interest.

COUNSEL

Overland & Borenstein, Mark E. Overland, Mark A. Borenstein and Kelley B. Poleynard for Petitioner.

No appearance for Respondent.

Keesal, Young & Logan, Stephen Young, Thomas R. Trainor and Dawn M. Schock for Real Parties in Interest UBS PaineWebber Inc. and Correspondent Services Corporation.

Hamburg, Karic, Edwards & Martin, Steven S. Karic and Fredric R. Brandfon for Real Party in Interest Bradford A. Phillips.

Bill Lockyer, Attorney General, David S. Chaney, Assistant Attorney General, Lawrence K. Keethe and Amy J. Winn, Deputy Attorneys General, as Amicus Curiae.

## OPINION

**MALLANO, J.**—The heir of a deceased investor filed this civil action against the investor's brokers, alleging mismanagement of the investor's accounts. The investment agreements signed by the investor required that all controversies be decided by arbitration before one of the securities industry self-regulatory organizations (SRO's). But all of the SRO's refuse to conduct arbitrations in California because they do not want to comply with the ethical standards for arbitrators recently promulgated by the California Judicial Council. The SRO's take the position that the standards are preempted by federal law.

Yet, after this action was filed, the brokers moved to compel arbitration. They assert that an SRO would arbitrate the dispute if the heir waives the Judicial Council's ethical standards or agrees to hold the arbitration outside California. The heir has declined both options. On motion by the brokers, the trial court ordered the case to arbitration. The heir challenges that order.

We conclude that the trial court should first decide if California is a proper location for the arbitration, applying principles that determine whether a

forum selection clause is valid. If California is the proper location, the dispute should be tried in a court in California because the SRO will not arbitrate the matter here. But if an out-of-state location is proper, the dispute should be resolved through arbitration there.

## I

## BACKGROUND

This case is before us by way of a petition for writ of mandate seeking to overturn the trial court's order directing plaintiff to arbitrate claims against the brokers for unlawful trading practices.

### A. *The Petition*

The petition alleges as follows. In 1991, Beth Lobel inherited a stock portfolio valued between $700,000 and $800,000. By 1995, she had become a successful trader in her own right. She opened several brokerage accounts and individual retirement accounts (IRA's) at Interfirst Capital Corporation (Interfirst). Her broker was James Copping, who was supervised at Interfirst by Brett Briggs and Bradford Phillips.

Correspondent Services Corporation (CSC) and UBS PaineWebber, Inc. (PaineWebber), the parent company of CSC, processed the trades made by Interfirst on Lobel's accounts. CSC "carried" those accounts. PaineWebber was also the trustee for Lobel's IRA's. PaineWebber acted as a clearinghouse for the trades made from Lobel's Interfirst accounts. Interfirst and Copping initiated several unauthorized trades that were processed through CSC and PaineWebber.

With respect to each account, Lobel signed a customer agreement requiring the arbitration of disputes between the parties. The arbitration provisions read as follows or in similar language: "I agree and by carrying an account for me, CSC agree(s) that any and all controversies which may arise between me and CSC or between me and the organization that has introduced my account(s) carried by CSC Corporation concerning any account, transaction, dispute or the construction, performance or breach of this or any other agreement whether entered into prior, on, or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this agreement shall be held under and pursuant to and be governed by the Federal Arbitration Act, and shall be conducted before an arbitration panel convened by the New York Stock Exchange, Inc. (NYSE), or the National Association of Securities Dealers, Inc. (NASD). I may also select any other national securities exchange's arbitration forum upon which CSC is legally required to arbitrate

the controversy with me .... Such arbitration shall be governed by the rules of the organization convening the panel. I may elect in the first instance the arbitration forum, but if I fail to make such election ... then you may make such election. The award of the arbitrators, or of the majority of them, shall be final and judgment upon the award rendered may be entered in any court of competent jurisdiction."

Lobel died intestate on September 25, 2000. Lobel's son and sole heir, plaintiff Jordan Alan, was named the administrator of her estate. At the time of Lobel's death, her accounts totaled $1.5 million. Thereafter, Interfirst and Copping made questionable trades that reduced the value of the accounts to $700,000. PaineWebber and CSC processed the trades.

B. *The Complaint*

On September 24, 2002, plaintiff filed this action against Interfirst, PaineWebber, CSC, Copping, Phillips, and Briggs. (For convenience, we sometimes refer to all defendants as the brokers.) The complaint asserts causes of action for negligence, breach of fiduciary duty, breach of contract, and a violation of the California unfair competition law (Bus. & Prof. Code, § 17200 et seq.). In essence, the complaint alleges that defendants churned Lobel's accounts and made unauthorized, risky investment decisions that increased their commissions and substantially reduced the value of the accounts.[1]

C. *California's Ethical Standards for Arbitrators*

While plaintiff was contemplating litigation against the brokers, the California Legislature was considering new ethical standards for arbitrators who hear cases pursuant to the terms of an arbitration agreement. As provided by section 1281.85, subdivision (a), of the Code of Civil Procedure: "Beginning July 1, 2002, a person serving as a neutral arbitrator pursuant to an arbitration agreement shall comply with the ethics standards for arbitrators adopted by the Judicial Council pursuant to this section. The Judicial Council shall adopt ethical standards for all neutral arbitrators effective July 1, 2002 .... The standards shall address the disclosure of interests, relationships, or affiliations that may constitute conflicts of interest, including prior service as an arbitrator or other dispute resolution neutral entity, disqualifications, acceptance of gifts, and establishment of future professional relationships."

The Judicial Council fulfilled its statutory mandate, promulgating ethical standards for arbitrators effective July 1, 2002. The standards address, among

---

[1] Interfirst has since filed for bankruptcy and is not a party to this proceeding.

other things, the disclosures to be made by arbitrators to avoid doubts of impartiality, the disqualification of arbitrators, conducting the arbitration hearing, ex parte communications, confidentiality, compensation, and marketing. (See Cal. Rules of Court, appen., div. VI, Ethics Standards for Neutral Arbitrators in Contractual Arbitration, 23 pt. 2 West's Ann. Code Civ. Proc. (2003 supp.) pp. 527–542.)

In response to the ethical standards, the NYSE and the NASD announced that, as applied to them, the standards were preempted by federal law, namely, the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) and the Federal Arbitration Act (9 U.S.C. § 1 et seq.). They are litigating that issue in federal court. (See, e.g., *NASD Dispute Resolution v. Judicial Council of CA* (N.D.Cal. 2002) 232 F.Supp.2d 1055; *Mayo v. Dean Witter Reynolds, Inc.* (N.D.Cal. 2003) 258 F.Supp.2d 1097.) The NYSE and the NASD have refused to hear cases in California unless the claimant waives the ethical standards. In the alternative, the NYSE and the NASD will arbitrate disputes if the claimant agrees to hold the hearing outside California. In his amicus curiae brief filed in this appeal, the California Attorney General states, "[The] NASD and NYSE contend that the [Ethical] Standards do not apply in SRO arbitrations and have, since July of last year, unilaterally suspended hundreds of securities arbitrations in the State ...."

## D. SRO Arbitrations

Both the NYSE and the NASD are SRO's "registered with the [Securities Exchange Commission] pursuant to the Securities Exchange Act of 1934 ... ('the Exchange Act'). As part of the comprehensive system of federal regulation of the securities industry, the Exchange Act authorizes SROs within the securities industry to self-regulate their members subject to oversight by the United States Securities and Exchange Commission ('SEC'). SROs are subject to extensive oversight, supervision, and control by the SEC on an ongoing basis ....

"The Exchange Act directs SROs to adopt rules and by-laws that conform with the Exchange Act .... With some exceptions ..., the SEC must approve all SRO rules, policies, practices, and interpretations prior to their implementation.... Each SRO must comply with the provisions of the Exchange Act as well as its own rules....

"One of the functions of the SROs is to provide arbitral fora for the resolution of securities industry disputes .... Securities broker-dealers routinely include arbitration clauses in their customer agreements.... As a result, both the NYSE and the NASD ... provide arbitration services to their

members. The SEC has expansive power to regulate the SRO arbitration programs." (*Mayo v. Dean Witter Reynolds, Inc., supra*, 258 F.Supp.2d at pp. 1101–1102, citations and fn. omitted.)

Here, plaintiff chose to file a civil action to resolve the parties' dispute and did not elect an SRO forum in the first instance. Defendants PaineWebber and CSC (collectively PaineWebber) moved to compel arbitration pursuant to the Federal Arbitration Act, seeking to have the dispute heard under the auspices of the NASD. The motion did not specify a location for the arbitration. In addition, all defendants moved to stay the action pending arbitration. Plaintiff filed opposition. At the hearing on the motions, the trial court provided a tentative ruling in favor of defendants. Counsel for plaintiff sought to clarify the tentative ruling as follows:

"Mr. Borenstein: Are you compelling an arbitration ... before the New York Stock Exchange or the National Association of Securities Dealers when neither is appointing arbitrators? [¶] ... [¶] Or are you compelling arbitration to another state where the ethics rules don't apply?

"The Court: No, the former. The former. I'm not satisfied that they're not appointing arbitrators. I get the impression that, in fact, they are under certain circumstances. [¶] Is that correct, gentlemen?

"Mr. Trainor [counsel for PaineWebber]: That is correct, your Honor. [¶] ...

"Mr. Borenstein: Well, your Honor, the certain circumstances are if we waive the ethics rules or if we arbitrate outside California."

At the end of the hearing, the trial court granted the motions. Plaintiff petitioned this court for a writ of mandate. We issued an order to show cause, established a briefing schedule, and set the matter for oral argument. Having considered the parties' arguments, we conclude that the trial court's order should be vacated and the matter returned for that court to determine the proper location for the arbitration.

## II

## DISCUSSION

■ "Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court." (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.Rptr.2d 515].) We therefore review the trial court's ruling

de novo. (See *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71–72 [100 Cal.Rptr.2d 683].)

### A. *Interpretation of the Arbitration Provisions*

In moving to compel arbitration, PaineWebber chose the forum provided by the NASD from among those permitted in the customer agreements. The arbitration rules of the NASD are found in its "Code of Arbitration Procedure" consisting of 35 single-spaced pages. The code governs the composition of panels, use of "public" and "nonpublic" arbitrators, exercise of peremptory challenges, joinder of parties, production of documents, dismissal of proceedings, tolling of time limitations, default procedures, and the payment of filing fees and forum fees.

■ The arbitration provisions in Lobel's customer agreements are to be construed in accordance with their plain meaning. (See *Taylor v. Investors Associates, Inc.* (5th Cir. 1994) 29 F.3d 211, 216; *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden* (1st Cir. 1986) 795 F.2d 1111, 1118.) Those provisions state in this or similar language: "[A]ny arbitration ... shall be conducted before an arbitration panel convened by the [NYSE] or the [NASD].... Such arbitration shall be governed by the *rules of the organization* convening the panel. [The investor] may elect in the first instance the arbitration *forum*, but if [the investor] fail[s] to make such election, ... then [the broker] may make such election." (Italics added.)

As we read the arbitration provisions, the parties are required, as an integral part of the agreements between them, to submit their disputes to an arbitral forum designated in the arbitration provisions. Thus, if an SRO—here, the NASD, the forum selected by the brokers—declines to hear the matter, the dispute is to be tried in court. In other words, the arbitration provisions mean that *all* arbitrations must be conducted in a *forum* convened by, and subject to the *rules* of, the chosen SRO. This is so because, as we next discuss, the arbitration provisions encompass more than the simple task of appointing an arbitrator. They determine the selection of a "forum"—a court *or* arbitral tribunal—each with its own set of rules and procedures.[2]

Our interpretation of the arbitration provisions is supported by *In re Salomon Inc. Shareholders' Derivative Lit.* (2d Cir. 1995) 68 F.3d 554 (*Salomon*). There, shareholders brought a derivative action against ex-Salomon officers who had signed agreements providing for arbitration before

---

[2] "Forum" means "a place of jurisdiction; a place of litigation; an administrative body. [A] [p]articular place where [a] judicial or administrative remedy is pursued." (Black's Law Dict. (6th ed. 1990) p. 655, col. 2.) A forum is a "tribunal" or "court." (Webster's Third New Internat. Dict. (1993 ed.) p. 896, col. 2.)

the NYSE of any dispute arising out of their employment. The defendants moved to compel arbitration under the Federal Arbitration Act. The district court granted the motion and referred the matter to the NYSE.

Before the NYSE, the shareholders contended that the dispute was not arbitrable. The secretary of the NYSE decided that the matter should not be arbitrated, relying on the NYSE's discretion, as set forth in its constitution, to " 'decline in any case to permit the use of [its] arbitration facilities' ...." (*Salomon, supra,* 68 F.3d at p. 556.) The NYSE board affirmed the secretary's decision on the ground, among others, that " 'shareholders' derivative litigation ... is foreign to the procedures and mechanisms employed in NYSE arbitration.' " (*Ibid.*)

The case returned to the district court, where the motion to compel arbitration was formally denied and the matter set for trial. The defendants appealed. The Second Circuit affirmed, stating: "[U]nder the arbitration agreements, all disputes were to be arbitrated by the NYSE and only the NYSE, 'in accordance with the [NYSE] Constitution and rules.' The NYSE Constitution clearly permits the NYSE to refuse the use of its facilities for the arbitration of any particular dispute.... When the NYSE so refuses, there is no further promise to arbitrate in another forum.

"... By now, it is axiomatic that 'federal policy strongly favors arbitration as an alternative dispute resolution process....' '[W]hile it is still the rule that parties may not be compelled to submit a commercial dispute to arbitration unless they have contracted to do so, federal arbitration policy requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." '

"The question we decide ... is not *whether* shareholder derivative suits are arbitrable, but *where* this dispute—whatever its nature—may be arbitrated under the agreements. Although the federal policy favoring arbitration obliges us to resolve any doubts in favor of arbitration, we cannot compel a party to arbitrate a dispute before someone other than the NYSE when that party had agreed to arbitrate disputes only before the NYSE and the NYSE, in turn, exercising its discretion under its Constitution, has refused the use of its facilities to arbitrate the dispute in question.... [¶] ...

"... The defendants argue that the final clause of their respective arbitration agreements—which requires them to arbitrate 'in accordance' with the provisions of the NYSE Constitution and NYSE rules—is simply a choice of law provision. Arbitration need not take place before the NYSE, they contend, so long as the NYSE's rules govern in a proceeding brought before whichever arbitral body hears the dispute. We cannot agree....

"Because the parties had contractually agreed that *only* the NYSE could arbitrate any disputes between them, [the district court] properly declined to appoint substitute arbitrators and compel arbitration in another forum.... [¶] ...

"[T]he arbitration agreements here required that any arbitration be before the NYSE, and not before any other arbitral forum. Accordingly, we will not disturb [the trial court's] decision to proceed to trial." (*Salomon, supra,* 68 F.3d at pp. 557–561, italics in original, citations omitted; accord, *Smith Barney v. Critical Health Systems of N.C.* (4th Cir. 2000) 212 F.3d 858, 861–862 (*Smith Barney*).)

In the present case, the parties' agreements obligate them to arbitrate before the SRO that PaineWebber elected, namely, the NASD, after plaintiff declined to choose an arbitral forum in the first instance. But the NASD "refused the use of its facilities [in California] to arbitrate the dispute in question." (*Salomon, supra,* 68 F.3d at p. 558.) "[Because] the [NASD] so refuses, there is no further promise to arbitrate in another [arbitral] forum[, for example, the American Arbitration Association (AAA)]." (*Id.* at p. 557; accord, *Luckie v. Smith Barney, Harris Upham & Co., Inc.* (11th Cir. 1993) 999 F.2d 509 [where customer agreement provided for arbitration before NYSE, NASD, or American Stock Exchange (AMEX), investor could not compel arbitration before AAA]; *Merrill Lynch v. Georgiadis* (2d Cir. 1990) 903 F.2d 109 [same].)

In that regard, one of the arbitration provisions in *Salomon, supra,* 68 F.3d 554, stated that disputes would be settled "in accordance with the arbitration procedure prescribed in the Constitution and rules then obtaining of the [NYSE]." (*Id.* at p. 558, bracketed material in original.) The other arbitration provisions were virtually identical. (*Ibid.*) Interpreting that language, the Second Circuit concluded that the NYSE was the "only" arbitral forum. (*Id.* at pp. 556–559, 561.) Here, because the arbitration provisions state that the arbitration "shall be governed by the rules of the organization convening the panel," *Salomon* is fully applicable to the selection of the NASD as the arbitral forum.

And in another case decided by the Second Circuit, the arbitration provision itself stated that disputes were to be settled by "arbitration *only* before the [NASD] or the [NYSE]." (*Merrill Lynch, Pierce, Fenner & Smith v. Georgiadis, supra,* 903 F.2d at p. 111, italics in original.) Nevertheless, "[t]he Second Circuit concluded that there was no real difference between an agreement that provided for arbitration 'only before' specified SROs, and an agreement that provided for arbitration 'in accordance with the rules' of

several SROs." (*Smith Barney, supra*, 212 F.3d at p. 862; accord, *PaineWebber, Inc. v. Rutherford* (2d Cir. 1990) 903 F.2d 106, 108.) Thus, *Salomon* governs regardless of whether the word "only" appears in an arbitration provision.

## B. *Appointment of Arbitrators by Statute*

Seeking to escape the import of *Salomon, supra*, 68 F.3d 554, PaineWebber relies on the California Arbitration Act (Code Civ. Proc., §§ 1280–1294.2). More specifically, PaineWebber points to Code of Civil Procedure section 1281.6 (hereafter section 1281.6), which states: "If the arbitration agreement provides a method of *appointing an arbitrator*, that method shall be followed. If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of *appointing an arbitrator* and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, *the court*, on petition of a party to the arbitration agreement, *shall appoint the arbitrator*." (Italics added.)

Section 1281.6 is of no relevance here. It governs only the method of appointing an arbitrator. But, as already discussed, the issue in this case is not so limited because PaineWebber seeks an arbitral *forum* provided by the NASD, including the application of the NASD's *rules*. Section 1281.6 "appears to be simply a legislative means of implementing [California's] policy in favor of arbitration by permitting parties to an arbitration contract to expedite the *arbitrator selection process*." (*Engalla v. Kaiser Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 981 [64 Cal.Rptr.2d 843, 938 P.2d 903], italics added.) It does not provide an arbitral forum when an SRO declines to participate.

Of significance, the Federal Arbitration Act has a provision (9 U.S.C. § 5) that mirrors section 1281.6.[3] In *Salomon, supra*, 68 F.3d 554, the defendants relied on that provision, arguing that the district court should have appointed

---

[3] The section of the Federal Arbitration Act provides: "If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator." (9 U.S.C. § 5.)

arbitrators given that the NYSE had refused to hear the matter. (*Id.* at p. 559–560.) The Second Circuit disagreed, concluding that the statute provided a remedy in the event of a "mechanical breakdown in the *arbitrator selection process*" (*id.* at p. 560, italics added), not where an SRO declines to arbitrate a dispute and leaves the parties without an arbitral forum. (See *Frederick v. First Union Securities, Inc.* (2002) 100 Cal.App.4th 694, 701–702 [122 Cal.Rptr.2d 774] [discussing *Salomon*].) "If an arbitration agreement designates an exclusive arbitral forum (e.g., the NYSE), and arbitration in that forum is not possible, courts may not compel arbitration in an alternate forum by appointing substitute arbitrators ...." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2002) ¶ 5:355.1, p. 5-173 (rev. # 1, 2002), italics omitted.)

"[Case law does not] stand[] for the proposition that ... courts may use [the Federal Arbitration Act] to circumvent the parties' designation of an exclusive arbitral forum.... [W]here 'it is clear that the failed [forum selection] term is not an ancillary logistical concern but rather is as important a consideration as the agreement to arbitrate itself, a court will not sever the failed term from the rest of the agreement and the entire arbitration provision will fail.' " (*Salomon, supra,* 68 F.3d at p. 561, italics omitted.)

■ We conclude that, here, the arbitration provisions will fail in their entirety without NASD participation because the forum selection provisions are an integral part of the agreements to arbitrate. The parties agreed to an NASD forum, and the NASD will not provide one in California. "[A]n agreement to arbitrate before a particular forum is as integral a term of a contract as any other, which courts must enforce." (*Wall Street Associates v. Becker Paribas, Inc.* (S.D.N.Y 1993) 818 F.Supp. 679, 683, affd. (2d Cir. 1994) 27 F.3d 845.)

As the United States Court of Appeals for the Fourth Circuit has held: "Here the agreement provides that arbitration will proceed in accordance with the rules of the three SROs[, the NYSE, NASD, and AMEX].... Where the parties have agreed explicitly to settle their disputes before particular arbitration fora, that agreement must control.... To hold otherwise would require us to impose a strained construction on a straightforward agreement. It is far better to interpret the agreement based on what is specified, rather than attempt to incorporate other remote rules by reference. Here [the investor] has the choice of three fora. We can see no reason to pass over the three specified fora and allow arbitration to proceed in a fourth unspecified arena." (*Smith Barney, supra,* 212 F.3d at p. 862.)

Finally, we acknowledge that consistent with the California Arbitration Act and the Federal Arbitration Act, if the obstacle to arbitration can be

resolved by the appointment of an arbitrator, a court may, under circumstances not present here, make such an appointment and compel the parties to arbitrate. (See, e.g., *Brown v. ITT Consumer Financial Corp.* (11th Cir. 2000) 211 F.3d 1217, 1222 [arbitration may proceed in forum not mentioned in arbitration clause where choice of arbitral forum was not integral part of agreement]; *Lewis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1986) 183 Cal.App.3d 1097, 1107 [228 Cal.Rptr. 345] [dictum stating that arbitral fora contained in arbitration provision were not exclusive arbitral fora; no analysis of whether choice of fora was integral term of agreement]; *McManus v. CIBC World Markets Corp.* (2003) 109 Cal.App.4th 76, 102 [134 Cal.Rptr.2d 446] [same].) But, as stated, in this case, the appointment of an arbitrator is not an adequate alternative to an NASD forum.

## C. *The Equities*

In *Salomon, supra,* 68 F.3d 554, the court noted that the equities did not favor the defendants, stating: "[T]he 'equities of the case' favor proceeding to trial.... Four years have elapsed, after all, since this suit began. While that delay may not be the defendants' fault, surely the plaintiffs are entitled to a speedy resolution of their claims." (*Id.* at p. 561.)

The same is true here. The challenges to the Judicial Council's ethical standards have just begun. Decisions of the federal district courts will be reviewed on appeal to the Ninth Circuit and from there, possibly on certiorari, by the United States Supreme Court. State court litigation will work its way up to the Courts of Appeal and then, by petition for review, to the California Supreme Court. ▮ And, of course, the decisions of federal district and circuit courts, although entitled to great weight, are not binding on state courts even as to issues of federal law. (See *Mullaney v. Woods* (1979) 97 Cal.App.3d 710, 719 [158 Cal.Rptr. 902]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 941–942, pp. 982–984.) It may be several years before the validity of the ethical standards is finally determined.

PaineWebber suggests that the arbitration hearing need not be scheduled or held pending the determination of whether the ethical standards are valid. We disagree. "[P]ublic policy favors arbitration as a speedy and inexpensive method of resolving disputes ...." (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 750 [222 Cal.Rptr. 1, 710 P.2d 833] (*Victoria*).) "[T]he purpose of arbitration is to voluntarily resolve private disputes in an expeditious ... manner." (*Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1080 [90 Cal.Rptr.2d 334, 988 P.2d 67] (*Broughton*).) And, as PaineWebber states in its return to the petition for writ of mandate, the "trial court was correct in enforcing the arbitration contract in this case *regardless of any decision as to whether the California Ethics Standards are preempted.*" (Italics added.)

## D. *Location of the Arbitration*

PaineWebber contends that plaintiff has no legitimate grounds to complain about being forced to attend an arbitration in another state because the forum selection clause in the NASD rules allows the NASD to conduct the hearing in any location it chooses. Rule 10315 of the NASD Code of Arbitration states: "The Director [of Arbitration] shall determine the time and place of the first meeting of the arbitration panel and the parties .... The arbitrators shall determine the time and place for all subsequent meetings." PaineWebber interprets this rule to allow the NASD to cease *all* arbitrations in California and require *all* resident investors to attend hearings outside the state, in such places as Las Vegas, Phoenix, Portland, and Seattle.

That interpretation is open to challenge because a court should "set[] aside the forum-selection clause ... [if] the agreement was '[a]ffected by fraud, undue influence, or overweening bargaining power'; ... [if] 'enforcement [of the agreement] would be unreasonable and unjust'; or ... [if] proceedings 'in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court.' " (*Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 632–633 [87 L.Ed.2d 444, 105 S.Ct. 3346]; accord, *Dominium Austin Partners, L.L.C. v. Emerson* (8th Cir. 2001) 248 F.3d 720, 726; *Hayes Children Leasing Co. v. NCR Corp.* (1995) 37 Cal.App.4th 775, 787, fn. 5 [43 Cal.Rptr.2d 650]; see *Bolter v. Superior Court* (2001) 87 Cal.App.4th 900 [104 Cal.Rptr.2d 888] [finding forum selection clause invalid]; *Wilmot v. McNabb* (N.D.Cal. 2003) 269 F.Supp.2d 1203 [same].)

█ Thus, in this case, the trial court should first decide whether the out-of-state location *selected by the NASD* is proper. At this point in the litigation, the NASD has not yet chosen a location. But when it does, the trial court should determine whether that location is proper, for example, whether the location is reasonable and just. If the out-of-state location is proper, the dispute should be resolved through arbitration there. If the out-of-state location is not proper, the dispute should be resolved here, and, under *Salomon, supra,* 68 F.3d 554, the case should be adjudicated in court. And the location of the arbitration, like other aspects of arbitration, is to be determined in an "expeditious" and "speedy" manner. (*Victoria, supra,* 40 Cal.3d at p. 750; *Broughton, supra,* 21 Cal.4th at p. 1080.) "We have recognized that expeditiousness is commonly regarded as one of the primary advantages of arbitration." (*Engalla v. Kaiser Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 978.)

E. *Preemption*

In his amicus curiae brief, the Attorney General of the State of California argues that the ethical standards for arbitrators are not preempted by federal law. The parties address that issue as well. "While we recognize the preemption issue has not been resolved in California, we find the answer to this case lies in general contract law principles. Keeping in mind the values of judicial economy, we confine our analysis accordingly." (*Bolter v. Superior Court*, *supra*, 87 Cal.App.4th at p. 906.)

The preemption issue is currently being litigated in the federal courts, where the NASD is the plaintiff in one case (*NASD Dispute Resolution v. Judicial Council of Cal.*, *supra*, 232 F.Supp.2d 1055) and an intervener in another (*Mayo v. Dean Witter Reynolds, Inc.*, *supra*, 258 F.Supp.2d 1097). Here, the NASD is not participating in any capacity, nor has it filed an amicus curiae brief. We therefore defer to the other civil actions in which the NASD is actively involved in determining whether the ethical standards for arbitrators are preempted by federal law.[4]

## III

## DISPOSITION

Let a peremptory writ of mandate issue, commanding respondent court to (1) vacate its order granting the motion to compel arbitration and the motion to stay the action and proceedings and (2) conduct further proceedings consistent with this opinion. Petitioner is entitled to costs in connection with this proceeding.

Spencer, P. J., and Ortega, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied October 29, 2003. George, C. J., and Baxter, J., did not participate therein.

---

[4] At oral argument, two issues were raised for the first time: (1) whether the ethical standards should be applied retroactively and (2) whether the investor waived the ethical standards prospectively by signing the customer agreements. ■ Because these issues were not timely raised, we do not reach them. (See *Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 167, fn. 8 [75 Cal.Rptr.2d 904].) They may be raised before the trial court.