Richard MAYO, on behalf of himself
and the People of California,
Plaintiff,

v.

DEAN WITTER REYNOLDS, INC.,
Morgan Stanley Dean Witter & Co.
dba Morgan Stanley Dean Witter, and
Does 1–50, Defendants.

No. C–01–20336JF (PVT).

United States District Court,
N.D. California.

April 22, 2003.

William E. Kennedy, Santa Clara, CA, for Plaintiff.

Sarah A. Good, Palo Alto, CA, Gilbert R. Serota, San Francisco, CA, for Defendants.

Ethan D. Dettmer, F. Joseph Warin, Mark A. Perry, Gibson, Dunn & Crutcher LLP, Washington, DC, for Intervenor NASD Dispute Resolution, Inc.

M. Benjamin Valerio, Linda Dakin–Grimm, Milbank, Tweed, et al., Los Angeles, CA, for Intervenor New York Stock Exchange, Inc.

Mary Maloney Roberts, Judicial Council of California, Office of the General Counsel, San Francisco, CA, for Judicial Council of California.

Amy J. Winn, Sacramento, CA, for Attorney General of the State of California.

Meyer Eisenberg, Jacob H. Stillman, Eric Summergrad, Douglas W. Henkin, Milbank, Tweed, Securities and Exchange Commission, Washington, DC, for Securities and Exchange Commission.

## ORDER DENYING PLAINTIFF'S MOTION TO VACATE ORDER COMPELLING ARBITRATION AND STAYING PROCEEDINGS

FOGEL, District Judge.

On February 4, 2002, the Court granted the motion of Defendant Morgan Stanley

Dean Witter & Co. ("Morgan Stanley") to compel arbitration and to stay proceedings. After Plaintiff commenced arbitration proceedings before the New York Stock Exchange, Inc. ("NYSE"), the Judicial Council of California promulgated new ethics standards for arbitrators in California. Plaintiff moves to vacate the Court's February 4, 2002 Order on the ground that the NYSE's refusal to appoint an arbitration panel that is compliant with the new California ethics standards constitutes an intervening change in circumstances requiring denial of the motion to compel arbitration. Morgan Stanley and Intervenors the NYSE and the National Association of Securities Dealers Dispute Resolution, Inc. ("NASDDR") oppose the motion. The Court has read the briefing submitted by the parties and has considered the oral arguments of counsel presented on November 25, 2002 and February 10, 2003. For the reasons set forth below, the Court concludes that federal law preempts application of the new California ethics standards to the NYSE and other "self-regulatory organizations." Accordingly, the motion will be denied.

## I. BACKGROUND

This suit arises out of allegedly unauthorized withdrawals from Plaintiff Richard Mayo's Morgan Stanley investment account. In June 2000, Plaintiff opened a Morgan Stanley "Active Assets Account" by completing and executing an account application, pursuant to which be agreed to abide by the terms and conditions of the Morgan Stanley Client Account Agreement. The Client Account Agreement includes a provision specifying that all disputes between the parties arising out of or concerning any Morgan Stanley account are subject to binding arbitration.

During October and November 2000, Plaintiff noticed a number of unauthorized withdrawals from his account, including thousands of dollars in point-of-sale trans-

actions and automated teller machine ("ATM") withdrawals. After Plaintiff reported these unauthorized withdrawals, Morgan Stanley recredited to his account the approximate amount of the complained of point-of-sale transactions, but it refused to recredit the amount corresponding to the complained of ATM withdrawals.

On March 14, 2001, Plaintiff filed suit in the Santa Clara Superior Court alleging that Morgan Stanley's failure to reimburse him for the amount of the unauthorized ATM withdrawals violates the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693, *et seq.*, and the state Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200, *et seq.* Plaintiff seeks monetary damages, as well as injunctive and restitutionary relief on behalf of himself and the general public of California.

Morgan Stanley removed the action to this Court on the basis of both diversity jurisdiction and federal question jurisdiction, and thereafter moved to compel arbitration pursuant to the arbitration provision in its Client Account Agreement. On February 4, 2002, the Court granted Morgan Stanley's motion to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* ("FAA"), and stayed proceedings pending completion of the arbitration process. Order Granting Motion to Compel Arbitration and to Stay Proceedings, Feb. 4, 2002 ("Arbitration Order"). In reaching this decision, the Court determined that the parties' agreement to arbitrate was valid and enforceable under the FAA. *Id.*

The arbitration provision in the Client Account Agreement provides for arbitration "only before the New York Stock Exchange, Inc.; the National Association of Securities Dealers, Inc.; or the Municipal Securities Rulemaking Board, as [Plaintiff] may elect." Client Account Agreement at

14.[1] On February 22, 2002, Plaintiff commenced arbitration proceedings before the NYSE by filing a statement of claim and executing a Uniform Submission Agreement ("USA"). The USA provides that the arbitration "will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization."

In July 2002, the NYSE informed Plaintiff that it would not appoint an arbitrator in his case at that time because it temporarily was suspending the assignment of all arbitrators in California in response to new ethics standards for arbitrators promulgated by the Judicial Council of California ("the Judicial Council") that took effect on July 1, 2002. NASDDR also temporarily suspended the assignment of arbitrators in California.

## A. The California Standards

The new California ethics standards for arbitrators are the result of legislation passed by the California Legislature and signed into law by the Governor in 2001. Senate Bill 475 requires that the Judicial Council "adopt ethical standards for all neutral arbitrators effective July 1, 2002." Cal.Code Civ. Proc. § 1281.85(a). SB 475 provides that the new standards, including arbitrator disclosure and disqualification requirements, apply to any person "serving as a neutral arbitrator pursuant to an arbitration agreement." *Id.* Pursuant to SB 475, in April 2002 the Judicial Council adopted new "Ethics Standards for Neutral Arbitrators in Contractual Arbitration" ("the California standards") that are codified at Division VI of the Appendix to the California Rules of Court. The California standards took effect on July 1, 2002. In December 2002, the Judicial Council approved various revisions to the California standards that took effect on January 1, 2003.

The California standards are intended "to promote public confidence in the arbitration process." Ethics Std. 1(a). Among other things, the California standards provide that: "[a] person who is nominated or appointed as an arbitrator must disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed arbitrator would be able to be impartial." Ethics Std. 7(d). Standard 7 expands on pre-existing statutory disclosure requirements by setting forth a non-exhaustive list of thirteen distinct categories of information that arbitrators must disclose. *See* Ethics Std. 7(d).[2] Standard 8 requires

---

1. The "Arbitration of Controversies" section of the Client Account Agreement states in relevant part:

> You agree that all controversies between you or your principals or agents and Morgan Stanley Dean Witter or its agents (including affiliated corporations) arising out of or concerning any of your accounts, orders or transactions, or the construction, performance, or breach of this or any other agreement between us, whether entered into before or after the date an account is opened, shall be determined by arbitration only before the New York Stock Exchange, Inc.; the National Association of Securities Dealers, Inc.; or the Municipal Securities Rulemaking Board, as you may elect.

Client Account Agreement at 14.

2. These categories include information regarding family relationships with a party; family relationships with a lawyer in the arbitration; significant personal relationships with a party or a lawyer for a party; service as an arbitrator for a party or a lawyer for a party; compensated service as another dispute resolution neutral involving a party or lawyer for a party; current arrangements for prospective neutral service; attorney-client relationships with a party or lawyer for a party; other professional relationships with a party or lawyer for a party; financial interests in a party; financial interests in the subject matter of the arbitration; interests that could be substantially affected by the outcome of the arbitration; personal knowledge of relevant disputed facts; and membership in organiza-

additional disclosures "in consumer arbitrations in which a dispute resolution provider organization is administering the arbitration." Comment to Ethics Std. 8. *See* Ethics Std. 8. The disclosures required by the California standards also are expressly mandated by statute. *See* Cal.Code Civ. Proc. § 1281.9(a)(2).

Standard 10 provides that a proposed arbitrator's failure to make the disclosures required by the California standards results in disqualification upon notice by any party entitled to receive the disclosure. *See* Ethics Std. 10(a). A proposed arbitrator also may be disqualified on the basis of a disclosure that is a ground for disqualification upon notice by any party entitled to receive the disclosure. *See id.* In addition, Standard 10 restates pre-existing disqualification requirements and procedures found in California Code of Civil Procedure § 1281.91. *See id.*

The grounds for vacatur of an arbitration award are established by statute, not the California standards. As amended by SB 475, California Code of Civil Procedure § 1286.2 provides that a court "shall vacate" an arbitration award if it determines that:

> An arbitrator making the award either: (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware; or (B) was subject to disqualification upon grounds specified in 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision.

Cal.Code Civ. Proc § 1286.2(a)(6). In other words, failure to comply with the disclosures required by the California standards results in mandatory vacatur of an arbitration award.

With the exception of Standard 8, the California standards apply to all neutral

arbitrators appointed on or after July 1, 2002. *See* Ethics Std. 3. Standard 8 does not apply to neutral arbitrators appointed before January 1, 2003. Nothing in SB 475 purported to give the Judicial Council any authority to enforce the California standards. *NASD Dispute Resolution, Inc. v. Judicial Council of California,* 232 F.Supp.2d 1055, 1058 (N.D.Cal.2002). Rather, SB 475 depends upon private implementation. *Id.* at 1066.

## B. Self–Regulatory Organizations

The NYSE, the second oldest national securities exchange in the United States, and the National Association of Securities Dealers ("NASD"), a national securities association, are "self-regulatory organizations" ("SROs") registered with the SEC pursuant to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.* ("the Exchange Act"). As part of the comprehensive system of federal regulation of the securities industry, the Exchange Act authorizes SROs within the securities industry to self-regulate their members subject to oversight by the United States Securities and Exchange Commission ("SEC"). SROs are subject to extensive oversight, supervision, and control by the SEC on an ongoing basis. *See* 15 U.S.C. § 78s; *Austin Mun. Securities, Inc. v. Nat'l Ass'n of Securities Dealers, Inc.,* 757 F.2d 676, 680 (5th Cir.1985).

The Exchange Act directs SROs to adopt rules and by-laws that conform with the Exchange Act. *See* 15 U.S.C. §§ 78f(b), 78o–3(b). With some exceptions not relevant here, the SEC must approve all SRO rules, policies, practices, and interpretations prior to their implementation. *See* 15 U.S.C. § 78s(b). Each SRO must comply with the provisions of the Exchange

tions practicing discrimination. Ethics Std. 7(d)(1)-(13).

Act as well as its own rules. *See* 15 U.S.C. § 78s(g).

One of the functions of the SROs is to provide arbitral fora for the resolution of securities industry disputes. "Arbitration has long been a preferred remedy in the securities industry." *In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.,* 71 F.3d 298, 301 (8th Cir.1995). Securities broker-dealers routinely include arbitration clauses in their customer agreements. *See Securities Industry Ass'n v. Connolly,* 883 F.2d 1114, 1116 (1st Cir.1989). As a result, both the NYSE and the NASD, through its wholly-owned subsidiary NASDDR, provide arbitration services to their members.[3] The SEC has expansive power to regulate the SRO arbitration programs. *Roney & Co. v. Goren,* 875 F.2d 1218, 1221 (6th Cir.1989).

Arbitration services provided by the NYSE are conducted in accordance with the NYSE Arbitration Rules; those provided by NASDDR are conducted in accordance with the NASD Code of Arbitration Procedure. Intervenors the NYSE and NASDDR[4] contend that the obligations imposed by the California standards are in conflict with their obligations under their own SEC-approved rules. Prior to adoption of the California standards, Intervenors unsuccessfully had sought from the California Legislature and from the Judicial Council an exemption for themselves and other SROs from the California standards. *See* Declaration of Robert S. Clemente in Opposition to Plaintiff's Motion to Vacate Order Compelling Arbitration ("Clemente Decl.") ¶ 34.

## C. Response by the NYSE to Adoption of the California Standards

On July 22, 2002, Intervenors filed in this district a complaint for declaratory relief against the Judicial Council and its members (in their official capacities) seeking an exemption for SROs from the California standards. Intervenors and the SEC, as amicus, argued that application of the California standards to SROs is preempted by the Exchange Act and by the FAA.

Shortly after filing the declaratory relief action, the NYSE began to offer California investors the option of having their arbitrations heard outside of California, in which case the California standards would not apply. The NYSE's temporary moratorium on assigning arbitrators in California remained in effect. Plaintiff filed the instant motion to vacate the Arbitration Order on August 5, 2002 on the ground that the NYSE's suspension of the assignment of arbitrators in California makes his agreement to arbitrate void for impossibility, void as unconscionable, and void for frustration of purpose. The NYSE subsequently designated Reno, Nevada as the location of Plaintiff's arbitration hearing.

On November 12, 2002, Judge Samuel Conti dismissed the declaratory relief action filed by Intervenors on the ground that the defendants are immune from suit under the Eleventh Amendment. *NASD Dispute Resolution, Inc. v. Judicial Council of California,* 232 F.Supp.2d 1055 (N.D.Cal.2002).[5] Judge Conti did not reach the issue of whether application of the California standards to SROs is preempted by federal law. *Id.* On the same day that Judge Conti issued his decision, the SEC granted accelerated approval to an interim NYSE rule for California arbitrations.[6] *See* SEC Release No. 34–

---

**3.** NASDDR was created in 2000 to replace NASD Regulation, Inc., and is the world's largest provider of securities arbitration services.

**4.** On February 3, 2003, the Court granted motions to intervene brought by the NYSE and NASDDR.

**5.** Intervenors have appealed Judge Conti's decision to the Ninth Circuit Court of Appeals.

**6.** On September 26, 2002, the SEC granted accelerated approval to a new interim NASD rule for California arbitrations, IM–10100(f)–(g). *See* SEC Release No. 34–46562, 67 Fed.

46816, 67 Fed.Reg. 69,793 (2002). The new rule, NYSE Arbitration Rule 600(g), requires California investors either to waive application of the California standards and proceed with arbitration in California or to proceed with arbitration out-of-state.[7] The SEC approved NYSE Arbitration Rule 600(g) as a six-month pilot program effective from November 12, 2002 to May 12, 2003. The NYSE notified affected investors, including Plaintiff, of the SEC's action.

Plaintiff refuses to proceed with arbitration pursuant to NYSE Arbitration Rule 600(g) on the ground that he is entitled to proceed with arbitration in California before an arbitration panel that is compliant with the California standards. By the instant motion, Plaintiff seeks to be relieved entirely from his obligation to arbitrate his dispute with Morgan Stanley. Morgan Stanley, Intervenors, and the SEC, as amicus, oppose the instant motion on the ground that application of the California standards to SROs is preempted by the Exchange Act and by the FAA.[8]

## II. LEGAL STANDARD

Plaintiff moves to vacate the Arbitration Order, although it is unclear under what authority such relief is sought. Once an order is entered, a court may set aside or change the order pursuant to a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or pursuant to a motion for reconsideration. SCHWARZER, ET AL., CALIFORNIA PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL ¶ 12:157 (The Rutter Group 2002). Rule 59 and Rule 60 do not apply unless a final judgment has been entered. FED. R. CIV. P. 59, 60. Because the Arbitration Order is not a final judgment or order, the instant motion cannot be brought under Rule 59 or Rule 60.

The local rules of this Court permit a party to move for reconsideration of an order only after obtaining leave of court to do so. CIVIL L.R. 7–9(a). A party requesting leave to file a motion for reconsideration pursuant to Civil Local Rule 7–9 must show:

(1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party must also show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or

(2) The emergence of new material facts or a change of law occurring after the time of such order; or

---

Reg. 62,085 (2002). The rule change requires industry parties in arbitration to waive application of the California standards for customers who also waive their application. The SEC approved the rule change to IM–10100 as a six-month pilot program effective from September 30, 2002 to March 30, 2003. *Id.* The SEC subsequently extended the rule change to IM–10100 until September 30, 2003. *See* SEC Release No. 34–47631, 68 Fed.Reg. 17,713 (2003).

7. NYSE Arbitration Rule 600(g) provides in relevant part:
    "[T]he affected customer(s) or an associated person of a member or member organiza-

tion who asserts a claim against the member or member organization with which she or he is associated may:
—  Request the Director [of Arbitration] to appoint arbitrators and schedule a hearing outside of California, or
—  Waive the California Standards and request the Director [of Arbitration] to appoint arbitrators and schedule a hearing in California."

8. The Court also received an amicus brief from the California Attorney General that is neutral with respect to Plaintiff's individual argument but which urges the Court not to find preemption.

(3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

CIVIL L.R. 7–9(b).

The Court construes the instant motion as a motion for reconsideration pursuant to Civil Local Rule 7–9(b)(2) on the basis of an intervening change in circumstances. Plaintiff did not obtain leave of court to file the instant motion in accordance with Civil Local Rule 7–9(a). Nonetheless, the Court will consider the merits of the instant motion because of the importance of the issues to be decided.

## III. DISCUSSION

As noted above, Plaintiff seeks to be relieved entirely from his obligation to arbitrate his dispute with Morgan Stanley; he does not seek the more limited relief of an arbitration panel that is compliant with the California standards. Because the Court construes the instant motion as a motion for reconsideration on the basis of an intervening change in circumstances, it must determine whether the NYSE's refusal to appoint an arbitration panel that is compliant with the California standards constitutes a change in circumstances that warrants the requested relief.

Disposition of the instant motion turns on a discrete question: is Plaintiff entitled to proceed before an arbitration panel that is compliant with the California standards? If this question is answered in the affirmative, the Court must determine whether the requested relief is appropriate. Plaintiff concedes that if he is not entitled to proceed before an arbitration panel that is compliant with the California standards, the instant motion must be denied.

## A. Agreement to Arbitrate

As with Morgan Stanley's original motion to compel arbitration, the Court's analysis begins with the Client Account Agreement entered into by the parties. As discussed above, the Client Account Agreement includes a provision specifying that all disputes between the parties must be resolved through binding arbitration before the NYSE, the NASD, or the Municipal Securities Rulemaking Board. Accordingly, the agreement to arbitrate contemplates application of the arbitration rules of one of these three arbitration service providers.

The agreement to arbitrate also includes the following general choice of law provision:

> The law of the State of New York will apply in all respects, including but not limited to determination of applicable statutes of limitation and available remedies. The award of the arbitrator or a majority of them shall be final, and judgment on the award may be entered in any state or federal court having jurisdiction.

Client Account Agreement at 14. The agreement to arbitrate thus establishes that New York substantive law and the procedural rules of either the NYSE, the NASD, or the Municipal Securities Rulemaking Board will apply to arbitration of Plaintiff's dispute with Morgan Stanley. Nowhere does the agreement to arbitrate indicate even implicitly that the California standards or any other California arbitration rules apply.[9] Nonetheless, Plaintiff contends that the California standards apply to arbitration of his dispute because they represent a fundamental state policy. For purposes of the instant motion the Court will assume *arguendo* that the

---

9. The Court recognizes that it would be a logical impossibility for the agreement to arbitrate to state expressly that the California standards apply because they were adopted after the parties entered into the Client Account Agreement.

choice of law provision in the Client Account Agreement does not preclude application of the California standards.[10]

In February 2002, Plaintiff executed the USA and filed it along with a statement of claim, commencing arbitration of his dispute with Morgan Stanley before the NYSE. The USA provides that arbitration "will be conducted in accordance with the Constitution, By–Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization." The USA clearly and unambiguously expresses Plaintiff's agreement to submit his dispute to arbitration in accordance with the NYSE arbitration rules; it leaves no room to infer that some other arbitration rules, such as the California standards, might apply.

Plaintiff nonetheless contends that the terms of the USA should not be enforced because he was coerced into signing the USA as a condition of obtaining access to an arbitral forum. The NYSE arbitration rules require that a claimant file an executed USA along with his or her statement of claim. *See* NYSE Arbitration Rule 612(a). An executed USA is a valid, binding agreement. *First Montauk Securities Corp. v. Menter,* 26 F.Supp.2d 688, 689 (S.D.N.Y.1998). After Plaintiff filed his statement of claim and executed the USA, Morgan Stanley filed an answer in accordance with the NYSE arbitration rules. At no time before filing the instant motion did Plaintiff contend that he was coerced

into signing the USA or take issue with its terms. Leaving this aside, Plaintiff's coercion argument is unpersuasive because Plaintiff cannot demonstrate that he was compelled to forego a choice he otherwise would have made.

■ Once the Court issued its Arbitration Order, Plaintiff could proceed with his claim only in one of the three arbitral fora specified in the Client Account Agreement: the NYSE, the NASD, or the Municipal Securities Rulemaking Board. "An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Accordingly, the procedural rules of the arbitral forum selected by Plaintiff would apply to arbitration of his dispute. Plaintiff had no contractual right to insist that any procedural rules other than those of the NYSE, the NASD, or the Municipal Securities Rulemaking Board would apply to that arbitration.

### B. Conflict Between the California Standards and the SRO Rules

The Court next turns to the issue of whether the obligations of the SROs under the California standards conflict with their obligations under their own SEC-approved rules.[11] The most obvious conflict arises from NYSE Arbitration Rule 600(g), which

---

**10.** Generally, California courts respect contractual choice of law provisions unless doing so would violate a fundamental policy of the state. *See Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459, 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992) (adopting Section 187 of the Restatement (Second) of Conflict of Laws). New York law contains no substantially similar equivalent to the California standards, and the legislative history of SB 475 reveals that California has a strong interest in protecting its citizens in private arbitrations.

It thus appears that the California standards represent a fundamental policy of California that is sufficient to outweigh the law of the contractual forum.

**11.** It is the Court's understanding that all SROs are subject to the same or substantially similar disclosure and disqualification requirements. Strictly speaking, however, only the rules of the NYSE and the NASD are before the Court in the present action.

requires California investors either to waive application of the new California standards and proceed with arbitration in California or to proceed with arbitration out-of-state.[12] The SEC granted accelerated approval to NYSE Arbitration Rule 600(g) as an interim rule effective from November 12, 2002 to May 12, 2003. *See* SEC Release No. 34–46816, 67 Fed.Reg. 69,793 (2002). Because NYSE Arbitration Rule 600(g) effectively precludes application of the California standards, it would be impossible for the NYSE to comply with this rule and the California standards.

The parties' briefing suggests that NYSE Arbitration Rule 600(g) applies to Plaintiff's agreement to arbitrate, although it is not clear that this necessarily is the case. NYSE Arbitration Rule 600(g) was approved and took effect after Plaintiff executed the USA, which provides that the arbitration "will be conducted in accordance with the Constitution, By–Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization." Article XI, section 2 of the NYSE Constitution states: "All arbitration proceedings shall be conducted in accordance with, and before arbitrators selected as provided by, such rules as the Board shall from time to time adopt." It is unclear whether Plaintiff is subject to revised versions of the NYSE rules that took effect after his arbitration proceedings began.

■ However, even if NYSE Arbitration Rule 600(g) does not apply to Plaintiff's own agreement to arbitrate, the California standards conflict with other provisions of the SRO rules in at least two other respects. First, an arbitrator is required to disclose more information under the California standards than under the SRO rules. Both the NYSE Ar-

bitration Rules and the NASD Code of Arbitration Procedure provide that:

> Each arbitrator shall be required to disclose to the Director of Arbitration any circumstance which might preclude such arbitrator from rendering an objective and impartial determination. Each arbitrator shall disclose:
>
> (1) Any direct or indirect financial or personal interest in the outcome of the arbitration;
>
> (2) Any existing or past financial, business, professional, family or social relationships that are likely to affect impartiality or might reasonably create an appearance of bias ...

NYSE Arbitration Rule 610(a); NASD Rule 10312(a). The SRO rules allow a party to request additional information about an arbitrator's background from the Director of Arbitration, but there is no requirement that the requested additional information be provided. *See* NYSE Arbitration Rule 608; NASD Rule 10308(b)(6). In contrast, the California standards require disclosure of "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed arbitrator would be able to be impartial." Ethics Std. 7(d). Information that must be disclosed under the California standards because it could cause one to "reasonably entertain a doubt" regarding an arbitrator's impartiality does not necessarily constitute information that would prevent an arbitrator from actually being impartial. The California standards thus require disclosure of information by an arbitrator even when that information does not disclose actual bias or partiality. Application of the California standards would require arbitrators to disclose information that need not be disclosed under the SRO rules. This conflict cannot be resolved by

---

**12.** Should Plaintiff seek to challenge NYSE Arbitration Rule 600(g) directly, he must bring such a challenge directly in a federal appeals court. *See* 15 U.S.C. § 78y.

the SROs simply by interpreting their rules more broadly to accommodate the California standards; such action would constitute a rule change subject to SEC approval.

Second, the California standards and SB 475 require disqualification of arbitrators in circumstances where the SRO rules do not. The SRO rules provide each party with the right to one peremptory challenge to remove an arbitrator selected by the Director of Arbitration. *See* NYSE Arbitration Rule 609; NASD Rule 10311. The Director of Arbitration has sole discretion to make all other disqualification decisions, including all disqualifications for cause. *See* NYSE Arbitration Rules 608–611; NASD Rules 10309–10313. The SRO rules thus establish a disqualification system that is controlled almost entirely by the Director of Arbitration. In contrast, the California standards and SB 475 permit disqualification of arbitrators upon notice by a party that an arbitrator either failed to make the required disclosures or made a disclosure that is a ground for disqualification. *See* Ethics Std. 10; Cal. Code Civ. Proc. § 1281.91. The disqualification system established by the California standards and SB 475 vests the parties with significantly greater authority to disqualify arbitrators than do the SRO rules.

For example, assume that an arbitrator disclosed information that was a ground for disqualification under both the NYSE arbitration rules and the California standards. Under the NYSE arbitration rules, the Director of Arbitration could exercise his discretion not to remove the arbitrator even if both parties were to request that he or she do so. Under the California standards and SB 475, both parties would have the right to disqualify the arbitrator. Application of the California standards thus would greatly reduce, if not eliminate in practice, the role of the Director of Arbitration in the disqualification process. The disclosure and disqualification requirements of the California standards are not merely more stringent than those of the SRO rules; the obligations of the SROs under the California standards actually conflict with their obligations under their own SEC-approved rules.[13]

## C. Federal Preemption

■■■ Morgan Stanley, Intervenors, and the SEC, as amicus, contend that application of the California standards to SROs is preempted by the Exchange Act and the federal regulatory scheme established pursuant to the Exchange Act, and by the FAA. Under the Supremacy Clause of the United States Constitution, state laws that interfere with or are contrary to federal laws are preempted and therefore are without effect. *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 941 (9th Cir.2002). There are three circumstances in which state law is preempted by federal law: "(1) express preemption, where Congress explicitly defines the extent to which its enactments preempt state law; (2) field preemption, where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy; and (3) conflict preemption, where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Industrial Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1309 (9th Cir.1997). For purposes of the feder-

---

**13.** The Court notes that the SEC commissioned an independent reviewer, Professor Michael A. Perino, to assess whether the disclosure requirements in the NYSE and NASD arbitration rules should be modified to reflect any of the disclosure requirements in the California standards. The SEC released Professor Perino's report on November 12, 2002, but has not endorsed its conclusions. *See* Brief Amicus Curiae of the SEC at 18.

al preemption doctrine, federal law includes statutorily authorized federal regulations. *City of New York v. F.C.C.*, 486 U.S. 57, 64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988).

■ "When considering preemption, no matter which type, 'the purpose of Congress is the ultimate touchstone.'" *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) (citations omitted). "Where the statute does not speak directly to the issue, we look to 'the goals and policies of the Act in determining whether it in fact preempts an action.'" *Id.* (citation omitted). Ordinarily, courts apply a presumption against preemption. *Id.* "However, 'when the State regulates in an area where there has been a history of significant federal presence' the presumption usually does not apply." *Id.* (citations omitted). Because of the well-established federal presence in the fields of arbitration and securities regulation, the presumption against preemption does not apply here.

For the reasons discussed below, this Court concludes that the Exchange Act and the federal regulatory scheme established pursuant to the Exchange Act, and the FAA preempt application of the California standards to the NYSE and other SROs.

## 1. Preemption by the Securities Exchange Act of 1934

"The Securities Exchange Act of 1934 and its subsequent amendments create a detailed, comprehensive system of federal regulation of the securities industry." *Swirsky v. Nat'l Ass'n of Securities Dealers*, 124 F.3d 59, 61 (1st Cir.1997). This regulatory scheme combines self-regulation by the securities exchanges with oversight and direct regulation by the SEC. *Feins v. Am. Stock Exch., Inc.*, 81 F.3d 1215, 1218 (2d Cir.1996). As part of this comprehensive system of federal regulation, Congress granted the SEC "broad

supervisory responsibilities" over SROs. *Austin Mun. Securities*, 757 F.2d at 680.

"In 1975, Congress amended the Exchange Act to vest more control in the SEC and to bolster the 'essential and continuing role of the federal government' in regulating the securities industry." *Sparta Surgical Corp. v. Nat'l Ass'n of Securities Dealers, Inc.*, 159 F.3d 1209, 1214 (9th Cir.1998) (citation omitted). *See* Securities Act Amendments of 1975, Pub.L. No. 94–29, 89 Stat. 97 (1975) ("the 1975 amendments"). As a result of the 1975 amendments, SROs are subject to extensive oversight, supervision, and control by the SEC on an ongoing basis. *See* 15 U.S.C. § 78s; *Austin Mun. Securities*, 757 F.2d at 680. "The legislative history of the 1975 amendments underscored that self-regulatory organizations 'are intended to be subject to the SEC's control and have no governmentally derived authority to act independently of SEC oversight.'" *Sparta*, 159 F.3d at 1214 (quoting H.R. REP. No. 123, 94th Cong., 1st Sess., 48–49 (1975)).

The Exchange Act requires SROs to register with the SEC and to promulgate rules and by-laws that conform with the Exchange Act. *See* 15 U.S.C. §§ 78f(b), 78o–3(b). With some limited exceptions not relevant here, all SRO rules, policies, practices, and interpretations must be approved by the SEC prior to their implementation. *See* 15 U.S.C. § 78s(b). Proposed rules are published in the Federal Register and are subject to public comment. *See id.* Section 19 of the Exchange Act permits the SEC to approve SRO rules only if they are consistent with the requirements of the federal securities laws. *Id.* In particular, prior to approval of a proposed SRO rule the SEC must find that it is designed "to protect investors and the public interest." 15 U.S.C. §§ 78f(b)(5), 78o–3(b)(6). In addition, the SEC "may abrogate, add to, and delete from" the rules of an SRO as it deems

necessary or appropriate if it does so in a manner consistent with the requirements of the Exchange Act. 15 U.S.C. § 78s(c). Each SRO must comply with the provisions of the Exchange Act as well as its own rules. *See* 15 U.S.C. § 78s(g).

As required by the Exchange Act, the SEC has reviewed and approved all the SRO rules, including those rules under which the SROs provide arbitration services.[14] The SEC also oversees the SRO arbitration programs through inspections of the SRO arbitration facilities. Inspections are conducted on a periodic basis "to identify areas where procedures should be strengthened, and to encourage remedial steps either through changes in administration or through the development of rule changes." SEC Release No. 34–40109, 63 Fed.Reg. 35,299, 35,303 n. 53 (1998).

Congress has not stated expressly that state laws affecting the regulation of SROs are preempted by the federal regulatory scheme established by the Exchange Act. However, states are not permitted to enforce a state law if it "conflicts with the federal law by standing as an obstacle to the full accomplishment of federal regulatory objectives or if compliance with the state law prevents compliance with federal law." *Golden Nugget, Inc. v. American Stock Exchange, Inc.*, 828 F.2d 586, 588 (9th Cir.1987). "Similarly, when there is

an overriding federal interest in the subject of the legislation, the Court finds preemption." *Id.* Courts also find preemption when a state law frustrates the purpose of national legislation or impairs the efficiencies of federal agencies to discharge their duties. *McClellan v. Chipman,* 164 U.S. 347, 357, 17 S.Ct. 85, 41 L.Ed. 461 (1896).

■ Morgan Stanley, Intervenors, and the SEC argue that the California standards are preempted by the Exchange Act and by the comprehensive federal system of regulation of the securities industry established pursuant to the Exchange Act. Because this position is not unreasonable and is supported by the SEC, it is entitled to great weight in the Court's preemption analysis.[15]

Plaintiff contends that application of the California standards is not preempted by the Exchange Act because the California standards and the SRO arbitration rules share similar goals with respect to disclosure and disqualification. While the two sets of rules indeed may share similar goals, this alone does not mean that the state rules are not at odds with the accomplishment of the federal regulatory objectives. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 380, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). "The fact of a common end hardly neutralizes conflicting means." *Id.*

---

**14.** In 1991, the SEC noted that it "has devoted a significant portion of its time and resources to the oversight of self-regulatory organization ('SRO') arbitration," and that since 1977 it "has maintained a strong and continual interest in the arbitration rules and procedures in pace at the various SROs ..." SEC Release No. 34–29151, 56 Fed.Reg. 21,-512, 21,513 (1991).

**15.** The Ninth Circuit gives " 'great weight' to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute." *Bank of America v. City and County of San Francisco,* 309 F.3d 551, 563 (9th Cir.2002) (citation

omitted) Here, the regulatory agency has submitted an amicus brief setting forth its position that the California standards are preempted by, among other things, the Exchange Act and the comprehensive federal system of regulation of the securities industry. The SEC's position with respect to the proper interpretation and application of the Exchange Act is entitled to great weight. *See Am. Bankers Ass'n v. Lockyer,* 239 F.Supp.2d 1000, 1014–15 (E.D.Cal.2002) (amicus brief submitted by Office of the Controller of the Currency setting forth its position that state law at issue was preempted by the National Bank Act entitled to "great weight" in preemption analysis).

Plaintiff contends that any additional obligations imposed upon SROs by the California standards are not inconsistent with the obligations of the SROs under their SEC-approved rules. As discussed above, the California standards conflict directly with the SEC-approved SRO rules in several respects. The clearest example of this conflict is NYSE Arbitration Rule 600(g), which essentially precludes application of the California standards. In granting approval to NYSE Arbitration Rule 600(g), the SEC determined that "the proposed rule change is consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder applicable to a national securities exchange ..." SEC Release No. 34–46816, 67 Fed. Reg. 69,793, 69,794 (2002). The SEC further stated:

> Specifically, the Commission finds that the proposal is consistent with section 6(b)(5) of the Act, which requires that the rules of a national securities exchange be designed to promote just and equitable principles of trade, as well as to remove impediments to and perfect the mechanism of a free and open market, and, in general, to protect investors and the public interest.

*Id.* The Court cannot disregard the SEC's regulatory findings regarding the propriety of NYSE Arbitration Rule 600(g), which make clear that in its view the California standards should not apply to SROs.

Moreover, the California standards conflict with SRO rules other than NYSE Arbitration Rule 600(g). As discussed above, the California standards would require arbitrators to disclose information that need not be disclosed under either NYSE Arbitration Rule 610 or NASD Rule 10312. Application of the California standards and SB 475 also would require disqualification of arbitrators and vacatur of arbitration awards in circumstances where the SRO rules do not. *See* NYSE Arbitration Rules 608–611; NASD Rules 10309–10313. As noted previously, the role of the Director of Arbitration in the disqualification process would be greatly reduced, if not eliminated, if the California standards applied to SROs.

Plaintiff argues that even if the California standards do conflict with the SRO rules, Morgan Stanley and Intervenors have not demonstrated that SROs would be unable to amend their rules to eliminate any conflict. In particular, Plaintiff asserts that no SRO has yet attempted to amend its rules to accommodate the California standards. Assuming that this is the case, it nonetheless is irrelevant to the present analysis because SROs have no obligation to comply with conflicting state arbitration rules or to propose rule changes to accommodate such rules.[16]

Morgan Stanley, Intervenors, and the SEC argue that the California standards also conflict with the federal regulatory scheme established pursuant to the Exchange Act and stand as an obstacle to the full accomplishment of the objectives of that scheme.[17] The comprehensive system

---

**16.** Indeed, the SEC's decision not to exercise its power under the Exchange Act to amend any SRO rules to accommodate the California standards and its approval of NYSE Arbitration Rule 600(g) indicate that any rule changes proposed by SROs to accommodate the California standards likely would be met with disapproval by the SEC.

**17.** Intervenors also argue that application of the California standards would place an im-

permissible burden on SROs and their arbitrators. Individuals who serve as NYSE arbitrators receive as compensation modest stipends that are substantially below those charged by non-SRO for-profit providers. *See* Clemente Decl. ¶ 24. Intervenors contend that increased costs of compliance with the disclosure requirements of the California standards would discourage individuals from serving as SRO arbitrators, thereby diminishing the pool of available SRO arbitrators.

of federal regulation of the securities industry is designed to provide uniform, national rules for participants in the securities markets. SROs are an integral part of this federal regulatory scheme. *See Desiderio v. Nat'l Ass'n of Securities Dealers, Inc.,* 191 F.3d 198, 201 (2d Cir. 1999), *cert. denied,* 531 U.S. 1069, 121 S.Ct. 756, 148 L.Ed.2d 659 (2001). An important function of the SROs is to conduct securities arbitrations throughout the United States, and the SEC oversees the SRO arbitration programs. In accordance with the federal regulatory scheme, the SRO arbitration rules apply uniformly across the states. Allowing California and the other states to adopt different requirements as to the manner in which SROs carry out their regulatory functions would conflict with the objectives of the federally regulated scheme of securities arbitration because it would destroy the uniformity of procedural rules applicable to SRO arbitrations.

Further, if the SROs were forced to comply with the California standards in the absence of a nationwide rule change by the SEC, they would be subject to a patchwork of state regulation that would lead to inconsistent disclosures and disqualifications across the states. Such a result would be at odds with the national function of SROs. For example, if the California standards and SB 475 apply to SROs, an SRO could appoint an arbitrator who would not be subject to challenge for cause in any state except California. In addition, an arbitration award that would be confirmed in any other state would be subject to vacatur in California under California Code of Civil Procedure § 1286.2(a)(6). Allowing the states to impose procedural rules on the SROs that are not approved by the SEC would over-

ride the federal regulatory scheme and result in different treatment of similarly situated investors based solely on their location.

The SEC argues persuasively that only it, not any state, is in a position to assess the effect of a rule change on SROs and to ensure that the SRO rules, including arbitration disclosure and disqualification requirements, are consistent with the provisions of the Exchange Act. The SEC aptly analogizes this case to *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), in which the Supreme Court considered whether the federal regulatory scheme that empowers the Food and Drug Administration ("FDA") to punish and deter fraud during the regulatory approval process preempted the plaintiffs' state law fraud-on-the-FDA claims. The court noted that the FDA used its authority "to achieve a somewhat delicate balance of statutory objectives" that would be upset by allowing the plaintiffs' state law claims. *Id.* at 348, 121 S.Ct. 1012. As a result, the court concluded that the claims at issue were preempted because allowing them "would exert an extraneous pull on the scheme established by Congress." *Id.* at 353, 121 S.Ct. 1012.

The disclosure and disqualification requirements of the SRO arbitration rules are tailored specifically to the specialized nature of securities arbitration, which often requires the expertise of participants in the securities industry. In approving the SRO arbitration rules, the SEC has exercised its regulatory authority under the Exchange Act to strike a particular balance of statutory objectives. As the SEC notes, it has considered whether additional disclosure and disqualification re-

---

Intervenors also assert that the SROs would incur substantial recordkeeping costs by complying with the California standards.

*See* Clemente Decl. ¶ 45. The Court has not relied on such considerations for purposes of its preemption analysis.

quirements will benefit investors and the public interest. That balance would be upset by application of the California standards, which are directed generally at private contractual arbitration. The Court agrees with the SEC that any changes to that balance should be made by the SEC, not by the states. Application of the California standards to SROs would exert "an extraneous pull" on the regulatory scheme established by Congress. As with the state law claims at issue in *Buckman*, the comprehensive federal system of regulation preempts application of the California standards to SROs.

The holding in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973), upon which Plaintiff relies, does not compel a contrary conclusion. In *Merrill Lynch*, the Supreme Court stated that conflicting state law "should be preempted by exchange self-regulation 'only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act.'" *Id.* at 127, 94 S.Ct. 383 (quoting *Silver v. New York Stock Exchange*, 373 U.S. 341, 361, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)). The court held that a NYSE rule requiring an employee of a brokerage firm to submit certain disputes to arbitration did not preempt application of a California statute that precluded compulsory arbitration of wage disputes. *Id.* at 135, 94 S.Ct. 383. The Supreme Court's decision was based in part on its determination that the NYSE rule at issue "would not be subject to the [SEC's] modification or review" under the Exchange Act. *Id.* However, *Merrill Lynch* was decided prior to enactment of the 1975 amendments, which greatly expanded the SEC's oversight of SRO arbitration rules and procedures.

The Supreme Court has recognized explicitly that as a result of the 1975 amendments, the SEC has "expansive power to ensure the adequacy of the arbitration procedures employed by the SROs." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 233–34, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). "In the exercise of its regulatory authority, the SEC has specifically approved the arbitration procedures of the New York Stock Exchange ... and the NASD." *Id.* at 234, 107 S.Ct. 2332. As discussed above, all new SRO rules, including those regarding arbitration procedures, are subject to approval and modification by the SEC.

Because it finds that the California standards conflict both with the SEC-approved SRO arbitration rules and with the comprehensive system of federal regulation of the securities industry established pursuant to the Exchange Act, the Court concludes that the Exchange Act and the federal regulatory scheme established pursuant to it preempt application of the California standards to the NYSE and other SROs.

### 2. Preemption by the Federal Arbitration Act

The Federal Arbitration Act "was designed 'to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate,' and place such agreements 'upon the same footing as other contracts.'" *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 474, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (citations omitted). Section 2 of the Federal Arbitration Act provides that a written agreement to arbitrate in any contract involving interstate commerce or a maritime transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state

substantive or procedural policies to the contrary." *Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987).

"The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt,* 489 U.S. at 477, 109 S.Ct. 1248. However, "state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law— that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Morgan Stanley, Intervenors, and the SEC contend that application of the California standards here would conflict with provisions of the FAA.

The FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms," *id.* at 478, 109 S.Ct. 1248, and such agreements "must be rigorously enforced.'" *Perry,* 482 U.S. at 490, 107 S.Ct. 2520. "[P]arties are generally free to structure their arbitration agreements as they see fit." *Volt,* 489 U.S. at 479, 109 S.Ct. 1248. Therefore, they may "specify the rules under which that arbitration will be conducted." *Id.*

"There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 66, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (quoting *Volt,* 489 U.S. at 476, 109 S.Ct. 1248). "Indeed, short of authorizing trial by battle or ordeal or, more doubtfully, by a panel of three monkeys, parties can stipulate to whatever procedures they want to govern the arbitration of their disputes." *Baravati v. Josephthal, Lyon & Ross, Inc.,* 28 F.3d 704, 709 (7th Cir.1994).

■ This Court granted Morgan Stanley's motion to compel arbitration under the FAA, finding that the agreement to arbitrate contained in the Client Account Agreement is valid and enforceable. *See* Arbitration Order. Plaintiff subsequently elected to proceed before the NYSE and executed the USA, a valid and enforceable post-dispute agreement to submit his dispute to arbitration in accordance with the NYSE arbitration rules. Under the USA, the parties agreed that "the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization," *i.e.,* the NYSE.

By executing the USA, Plaintiff incorporated the NYSE arbitration rules into his agreement to arbitrate. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, ——, 123 S.Ct. 588, 593, 154 L.Ed.2d 491 (2002) ("Howsam's execution of a Uniform Submission Agreement with the NASD in 1997 effectively incorporated the NASD Code into the parties' agreement."). In addition, the USA constitutes a separate agreement to arbitrate in accordance with the NYSE arbitration rules. There can be no doubt that Morgan Stanley and Plaintiff agreed on a specific set of procedural rules to govern arbitration of their dispute: the NYSE arbitration rules. That set of rules neither contemplates nor allows for application of the California standards or any other California arbitration rules. Indeed, the California standards had not even been promulgated when Plaintiff executed the USA. It would make no difference if Plaintiff had executed the USA after July 1, 2002—the date that the California standards took effect—because the USA represents a clear choice that the NYSE arbitration rules, and only those rules, would govern the arbitration of Plaintiff's dispute with Morgan Stanley.

**1114**

Under the FAA, Morgan Stanley has a right to enforce the arbitration agreement according to its terms. *Volt*, 489 U.S. at 478, 109 S.Ct. 1248. Morgan Stanley and Plaintiff agreed to arbitrate in accordance with the NYSE arbitration rules. Application of the California standards would impose inconsistent and conflicting procedural rules upon those specifically agreed upon by the parties. Because such a result is impermissible under § 2 of the FAA, the California standards, at least as applied here, conflict with the FAA and the federal policy embedded therein.[18]

Comparison of the arbitration agreements at issue here and in *Volt* is instructive. *Volt* involved an arbitration agreement that incorporated California state procedural rules allowing arbitration to be stayed pending resolution of related judicial proceedings. The Supreme Court held that the provision of the California Arbitration Act at issue was not preempted by the FAA because it neither affected the enforceability of the arbitration agreement itself nor undermined the FAA's "primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms." *Id.* at 479, 109 S.Ct. 1248. Here, Plaintiff and Morgan Stanley expressly agreed that arbitration of their dispute would be governed by the

NYSE arbitration rules. It is implicit in the parties' agreement that no other procedural rules, including by implication the California standards, will apply to arbitration of their dispute. Accordingly, a result opposite to that in *Volt* is compelled here.[19]

■ Morgan Stanley, Intervenors, and the SEC also argue that promulgation of the California standards is not an adequate basis for invalidating the parties' agreement to arbitrate because the California standards apply to only arbitration agreements as opposed to contracts generally. Section 2 of the FAA states that arbitration clauses are enforceable "save upon grounds as exist at law or in equity for the revocation *of any contract.*" 9 U.S.C. § 2 (emphasis added). State law may be applied to agreements to arbitrate "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry*, 482 U.S. at 492 n. 9, 107 S.Ct. 2520. "Courts may not, however, invalidate arbitration agreements under state laws applicable only to arbitration provisions." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (citations omitted).

Courts consistently have applied the FAA to preempt state laws that impose

**18.** The California Attorney General argues that the California standards do not offend any principle of the FAA because the Supreme Court stated in *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968): "We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." *Id.* at 149, 89 S.Ct. 337. However, preemption is not precluded even if the California standards and the FAA share similar goals. And, as discussed above, the California standards and SB 475 do a great deal more than require additional disclosure: for example, they significantly shift the power to

disqualify arbitrators from the SRO to the parties, and they compel mandatory vacatur of awards entered by arbitrators who fail to comply with the requirements of the California standards.

**19.** The Court's determination that the California standards, at least as applied here, are preempted by § 2 of the FAA is based on the agreement between Plaintiff and Morgan Stanley to arbitrate their dispute in accordance with a specific set of SRO arbitration rules that do not allow for application of the California standards. If an arbitration agreement allowed for application of California arbitration rules, the FAA preemption analysis might yield a different result.

requirements specific to arbitration agreements.[20] In *Doctor's Associates,* the Supreme Court examined a Montana statute that declared an arbitration clause to be unenforceable unless notice of the arbitration clause was typed in underlined capital letters on the first page of the contract. The court held that the Montana statute was preempted by § 2 of the FAA because it imposed on arbitration agreements a special requirement "not applicable to contracts generally." *Id.* at 687, 116 S.Ct. 1652.

The Ninth Circuit recently held that application of the California Consumer Legal Remedies Act is preempted by § 2 of the FAA. *See Ting v. AT&T,* 319 F.3d 1126, 1147–48 (9th Cir.2003). The court based its holding on its conclusion that the statute at issue was not a law of "general applicability" because it applied to only noncommercial contracts and consumer contracts. *Id.* At the same time, the court ruled that the contract defense of unconscionability is not preempted by the FAA. *Id.* at 1151–52. The court reasoned that "because unconscionability is a defense to contracts generally and does not single out arbitration agreements for special scrutiny, it may be raised consistent with § 2 of the FAA." *Id.* at 1151. This result is in accord with the Ninth Circuit's holding in *Ticknor v. Choice Hotels Int'l, Inc.,* 265

F.3d 931 (2001), *cert. denied, Choice Hotels Int'l, Inc. v. Ticknor,* 534 U.S. 1133, 122 S.Ct. 1075, 151 L.Ed.2d 977 (2002), that the FAA does not preempt state law governing the unconscionability of contracts.

In *Securities Industry Ass'n v. Connolly,* 883 F.2d 1114 (1st Cir.1989), *cert. denied, Connolly v. Securities Industry Ass'n,* 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990), the First Circuit held that Massachusetts regulations concerning pre-dispute arbitration agreements were preempted by the FAA. The court reasoned that "[t]he FAA prohibits ·a state from taking more stringent action addressed specifically, and limited, to arbitration contracts." *Id.* at 1120. The state regulations at issue in *Connolly* were aimed at securities broker-dealers who required customers to sign pre-dispute arbitration agreements.

There is no dispute that the California standards apply only to arbitration agreements and are not generally applicable to contracts. As argued by the SEC, the California standards are similar to the Massachusetts regulations that were found to be preempted by the FAA in *Connolly.*[21] Because the California standards apply to only arbitration agreements as opposed to contracts generally, they are not an adequate basis for invalidating the parties' agreement to arbitrate.

**20.** Of course, a state law may be preempted by the FAA even if it does not apply only to arbitration agreements. For example, in *Bradley v. Harris Research, Inc.,* 275 F.3d 884 (9th Cir.2001), the Ninth Circuit held that a provision of the California Franchise Relations Act that did not single out arbitration was preempted by the FAA because it was not generally applicable to contracts. *Id.* at 890.

**21.** Plaintiff contends that the Court should distinguish laws that directly affect the enforceability of an agreement to arbitrate from laws such as the California standards that affect the procedural rules governing arbitration but do not expressly preclude en-

forcement of the arbitration agreement. The California standards and SB 475 provide for disqualification of arbitrators and vacatur of arbitration awards under certain conditions, in which case the parties would start the arbitration process anew with a different arbitration panel. Unless a qualified arbitration panel could not be seated at all, application of the California standards would not render unenforceable an agreement to arbitrate. Nonetheless, the distinction advocated by Plaintiff does not affect the Court's preemption analysis because Plaintiff and Morgan Stanley agreed that the NYSE arbitration rules, and only those rules, would govern arbitration of Plaintiff's dispute.

Morgan Stanley and Intervenors also argue that application of the California standards would conflict with § 5 of the FAA, which provides that if the parties to an agreement to arbitrate choose "a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed." 9 U.S.C. § 5. Because the Court concludes that the California standards, at least as applied to arbitration of Plaintiff's dispute with Morgan Stanley, are preempted by § 2 of the FAA, it need not determine whether they also are preempted by § 5 of the FAA.[22]

For the reasons set forth above, the Court concludes that the Exchange Act preempts application of the California standards to SROs, and § 2 of the FAA further preempts application of the California standards to arbitration of Plaintiff's dispute with Morgan Stanley. Plaintiff thus has no legal entitlement to proceed before an arbitration panel that is compliant with the California standards. Under this circumstance, Plaintiff concedes that he cannot prevail on the instant motion.

## IV. CONCLUSION

This Court recognizes that the intent of the California standards is to promote public confidence in the arbitration process by requiring greater disclosure of the relevant background of potential arbitrators. However, as discussed herein, application of the California standards to the NYSE and other self-regulatory organizations is preempted by the Exchange Act and the comprehensive system of federal regulation of the securities industry established pursuant to the Exchange Act. Moreover, at least as they are applied here, the Cali-

fornia standards are preempted by § 2 of the FAA.

In ruling that federal law preempts application of the California standards to self-regulatory organizations, the Court expresses no opinion as to the wisdom of the California standards as a matter of California public policy. Nor should anything in this decision be read to suggest that the California standards are preempted by federal law for all purposes and under all circumstances; the decision is limited to the particular application of the California standards now before the Court.

Because application of the California standards to arbitration of Plaintiff's dispute with Morgan Stanley is preempted by federal law, Plaintiff has no enforceable legal right to proceed before an arbitration panel that is compliant with the California standards. It follows that the NYSE's refusal to appoint an arbitration panel that is compliant with the California standards does not constitute an intervening change in circumstances within the meaning of Civil Local Rule 7–9(b)(2). The Court thus will not relieve Plaintiff of his obligation to arbitrate his dispute with Morgan Stanley.

Good cause therefore appearing, IT IS HEREBY ORDERED that Plaintiff's motion to vacate the Court's February 4, 2002 Order Granting Motion to Compel Arbitration and to Stay Proceedings is DENIED.

---

**22.** Intervenors also contend that the California standards cannot be applied to SROs because the Judicial Council exceeded its authority by expanding the definition of "neutral arbitrator" in the California standards. The

Court need not determine this issue of state law because, as discussed above, application of the California standards to SROs is preempted by federal law.